Estate of Benedict E. Bogeaus, Deceased, Geoffrey Forsythe Bogeaus, Administrator v. Commissioner. Dolores M. Bogeaus v. Commissioner.
Estate of Bogeaus v. Commissioner
Docket Nos. 2905-67, 2906-67, 2907-67, 2908-67.
United States Tax Court
T.C. Memo 1970-101; 1970 Tax Ct. Memo LEXIS 260; 29 T.C.M. (CCH) 467; T.C.M. (RIA) 70101; April 30, 1970, Filed Sidney J. Matzner, 9465 Wilshire Blvd., Beverly Hills, Calif., for the petitioners. Richard C. Schwartz and Paul G. Wilson, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in the income tax of Benedict E. Bogeaus and Dolores M. Bogeaus for the years 1963 and 1964 in these consolidated cases as follows: Docket Number
Year
Deficiency
2905-67
1963
$ 1,303.66
2906-67
1964
22,270.33
2907-67
1963
1,357.48
2908-67
1964
22,327.37
*261 In the answers filed by respondent in docket Nos. 2905-67 and 2906-67, respondent asserted increased deficiencies as to Benedict E. Bogeaus in the amounts of $3,476.48 and $26,255.24, respectively. Respondent has abandoned his contention for such increased deficiencies and the parties have stipulated the correct amount of the 1963 deficiencies in docket Nos. 2905-67 and 2907-67. Petitioners in docket Nos. 2906-67 and 2908-67 have conceded certain adjustments in respondent's determinations of deficiencies. The net result is that in all of these consolidated cases the issues that are now to be decided are (1) whether Benedict E. Bogeaus sustained a capital loss of $100,000 in 1964 as a result of payment of amounts in settlement of pending lawsuits against himself and six corporations, and (2) whether Benedict E. Bogeaus was entitled to a deduction in 1964 of $14,500 for alleged legal and accounting expenses. Findings of Fact Some of the facts have been stipulated and they are found accordingly. Benedict E. and Dolores M. Bogeaus were husband and wife in 1963 and 1964 but certain marital differences existed between them which were not reconciled until sometime in 1964. They filed *262 their separate income tax returns and certain amended returns for 1963 and 1964 with the district director in Los Angeles. At the time of the filing of the petitions in these cases they were residents of Los Angeles, California. Benedict E. Bogeaus died August 23, 1968, after the petitions were filed and Geoffrey Forsythe Bogeaus was appointed administrator of his estate and the estate has been substituted as petitioner. In 1964 Benedict E. Bogeaus sold his interest in Tape-printer, Inc. for $328,746 which resulted in a long-term capital gain of $270,482, which amount was reported in his 1964 Federal income tax return. During the years in issue Benedict E. Bogeaus (sometimes referred to hereinafter as "Bogeaus") owned, and was president of, the following corporations: Pinecrest Productions, Inc.
Inter-Continent Films, Inc. Inter-Continent Releasing Organization Alpine Productions, Inc. During the years in issue, Filmcrest Productions, Inc. and Waverly Productions, Inc. were wholly-owned subsidiaries of Alpine Productions, Inc., and Bogeaus was president of these subsidiary corporations. Four lawsuits, entitled as follows, had been brought against Bogeaus and/or his *263 corporations in the Superior Court of the State of California, County of Los Angeles, on or about the dates indicated below: Wolf v. Bogeaus et al., No. 830918, December 30, 1963(hereinafter referred to as lawsuit "No. 1"); 468 Wolf v. Bogeaus et al., No. 834212, February 27, 1964 (hereinafter referred to as lawsuit "No. 2"); Beidner et al. v. Alpine Productions, Inc. et al., No. 837869, April 30, 1964(hereinafter referred to as lawsuit "No. 3"); and Beidner et al. v. Pinecrest Productions, Inc. et al., No. 837870, April 30, 1964 (hereinafter referred to as lawsuit "No. 4"). B. Wolf, the plaintiff in lawsuits No. 1 and No. 2, was an assignee for the sole purpose of bringing those two lawsuits. Rexford Investment Company (in which Beidner was one of the partners) was the real party in interest in lawsuits Nos. 1, 3 and 4, and Rexford Investment Company and George R. Beidner, individually, were the real parties in interest in lawsuit No. 2. The plaintiffs in the said lawsuits alleged that various debts were due Rexford Investment Company (a partnership) and George R. Beidner, individually, from Bogeaus personally and from certain of his corporations. Suits Nos. 1 and *264 2 sought recovery against Bogeaus personally based on one promissory note in the face amount of $10,000; another promissory note in the face amount of $25,000, on which $10,293.23 was alleged to be due and an open account in which $15,142.97 was alleged to be due. All four suits sought recovery against the corporations on their notes and open accounts in the total amount of around $140,000. Some of this indebtedness was secured by mortgages given by the corporations on motion pictures owned by the corporations. On May 15, 1964, Bogeaus and his corporations (Inter-Continent Films, Inc.; Inter-Continent Releasing Organization; Alpine Productions, Inc.; Waverly Productions, Inc.; Pinecrest Productions, Inc.; and Filmcrest Productions, Inc.) entered into an agreement with Rexford Investment Company, George R. Beidner, individually, and B. Wolf, whereunder these four lawsuits were settled. The agreement provided that the parties would settle the obligations alleged by the plaintiffs in lawsuits No. 1 and No. 2 on the following basis: (1) $100,000 was to be paid from the money of Benedict E. Bogeaus which was under attachment in these two lawsuits; and out of this $100,000: (a) $25,000 *265 was to be paid in full satisfaction of Bogeaus' individual debts; (b) Bogeaus was to "lend" the remaining $75,000 to his corporations and they, in turn, would pay the said $75,000 in full satisfaction of the remaining obligations alleged in lawsuits No. 1 and No. 2. (2) In addition to the above mentioned $100,000, certain other amounts were to be paid to others (not parties to the agreement) out of the attached funds of Bogeaus; and (3) The property of Bogeaus and Waverly Productions, Inc. would be released from the attachments which had been made thereon in lawsuits No. 1 and No. 2. Under the agreement of May 15, 1964, the parties settled the obligations alleged by the plaintiffs in lawsuits No. 3 and No. 4 on the following basis: (1) Rexford Investment Company was to receive $150,000 (plus interest) payable entirely out of the revenues produced by certain motion pictures owned by Bogeaus' corporations; (2) Upon receipt of the above said $150,000, Rexford Investment Company would cause to be discharged certain note and mortgage obligations of the corporate defendants. In further consideration for the aforesaid settlement of all four lawsuits, the agreement provided that *266 Rexford Investment Company would thereafter receive in perpetuity one-half of the net producer's share of the proceeds from certain enumerated motion pictures owned by Bogeaus' corporations, that B. Wolf was thereby reassigning to her assignors, Rexford Investment Company and George R. Beidner, respectively, all of her interest in the claims and causes of action described in the agreement, and that the said lawsuits were to be dismissed. Pursuant to the terms of the agreement, the attachments of Bogeaus' funds were released and on May 19, 1964, the following amounts were disbursed therefrom to the parties to the agreement: $89,526.66 to Rexford Investment Company $10,473.34 to George R. Beidner, individually $50,824.87 to Benedict E. Bogeaus The said $89,526.66 paid to Rexford Investment Company and $10,473.34 paid to George R. Beidner comprised the $100,000 amount which the agreement provided was to be paid in settlement of lawsuits No. 1 and No. 2. 469 In their Federal income tax returns filed for the year 1964, Benedict E. Bogeaus and Dolores M. Bogeaus claimed a shortterm capital loss of $100,000 (composed of the $89,526.66 paid to Rexford Investment Company and *267 the $10,473.34 paid to George R. Beidner), which respondent disallowed. Alpine Productions, Inc. and its subsidiaries, Waverly Productions, Inc. and Filmcrest Productions, Inc. were insolvent as of the beginning of the year 1963. Pinecrest Productions, Inc., Inter-Continent Releasing Organization, and Inter-Continent Films, Inc. were insolvent as of the beginning and end of the year 1963. Bogeaus' 1964 return lists his occupation as "Consultant and Producer." The business schedule attached to the return shows gross profit from business of $11,500 and after subtracting the listed business deductions it shows a net loss from his business of $28,998. Respondent disallowed three of the business deductions (totaling $32,013), one of them being a deduction for $14,500 for legal and accounting expenses. This is the only business deduction now in dispute. The notice states the deduction was disallowed "* * * since you have failed to establish that such amounts constitute ordinary and necessary business expenses or were expended for the purposes designated." In 1964 Bogeaus paid an attorney named Adele I. Springer $9,150 for legal services in connection with the four lawsuits previously *268 mentioned and $1,300 for legal services in connection with another suit involving the threatened foreclosure of a mortgage on his home which had been given to help his corporations, and $113.50 for legal services in connection with another attachment suit involving claimed commissions due from the proceeds of the sale of Bogeaus' interest in Tapeprinter, Inc. In 1964 Bogeaus paid $1,035 to an attorney named Mitchell Moidel for legal services in connection with the same suit mentioned above involving a threatened foreclosure of the mortgage on his home. In 1964 Bogeaus paid $3,250 to an attorney named Lawrence M. Weinberg for legal services performed in 1961 in connection with Bogeaus' leasing of a credit card pressing machine to a company known as Dashew Business Machines. Opinion In 1964 Bogeaus sold his interest in Tapeprinter, Inc. for $328,746. This resulted in a long-term capital gain to Bogeaus in the amount of $270,482. In reporting his net long-term capital gain Bogeaus deducted a $100,000 payment he had made in settlement of certain lawsuits as a short-term capital loss labeling this payment as "Payment of guarantee for insolvent Corps." Sometime prior to May of *269 1964 four lawsuits had been filed in the Superior Court of California for the County of Los Angeles. The plaintiffs in these suits were either creditors or the assignee of creditors of Bogeaus' corporations. The defendants in all of the suits were Bogeaus' corporations. In actions 1 and 2 where Bogeaus was also a party defendant the plaintiffs secured a writ of attachment which was levied on Bogeaus' money, in the form of a certified check payable to Bogeaus in the sum of $172,363, and some notes owned by Bogeaus. One hundred thousand dollars of the money under attachment was used in settling these two lawsuits where Bogeaus was a named defendant. The agreement of settlement provided $25,000 was in settlement of Bogeaus' debts and Bogeaus was to "lend" the balance, or $75,000, to the corporations to enable them to settle their debts. It is petitioners' argument that the $100,000 short-term capital loss resulted from the use of his $100,000 in the settlement of the above lawsuits. But $25,000 of the said $100,000 was used to settle Bogeaus' personal liability on two notes and an open account. This payment could not result in any short-term capital loss under any theory. *270 The $75,000 advancement in 1964 to pay corporate debts could result in a capital loss if, (1) the advancement was payment in satisfaction of Bogeaus' guaranty liability for his insolvent corporations' debts, (2) if the advancement was a voluntary nonbusiness loan from Bogeaus to the corporations that was not worthless when made in May of 1964 but became worthless later in 1964 (sec. 166), or (3) if the advancement was a contribution by Bogeaus to the capital of his corporations and his stock in the corporations became worthless in 1964. The record here affords no basis for a conclusion that the advancement to pay corporate debts resulted in a capital loss based on (2) or (3) above. It is true the settlement agreement stated Bogeaus was to "lend" the $75,000 to the corporations to pay their debts. But petitioner does not argue Bogeaus made a voluntary loan to the 470 corporations. The evidence shows the prospects for repayment were remote. There were no notes evidencing any indebtedness. There was no evidence with respect to interest or repayment terms. There was no evidence as to how the advancements were treated on the books of *271 the corporations. Then, too, if one could find there was a loan of this $75,000, there is still no evidence that such a loan made to the corporations in May of 1964 was not worthless when made but became worthless later in the year 1964. Mere evidence that the corporations were insolvent in the years 1963 and 1964 would be insufficient to show that debts made in May of 1964 became worthless that year. The facts and circumstances of this case indicate that the advancement made to the corporations would be contributions by Bogeaus to the capital of his corporations. Fred A. Bihlmaier, 17 T.C. 620 (1951), and Reading Co. v. Commissioner, 132 F. 2d 306, 310 (1942), affirming a Memorandum Opinion of this Court. But no capital loss deduction could result from such consideration because there is no evidence that Bogeaus' stock in the corporations became worthless in 1964. It is petitioners' position that the advancement by Bogeaus was in satisfaction of his own guaranty liability. This is what he stated on his 1964 return and what he alleged in his petition filed in this Court. And the only argument petitioners make on brief is that the entire $100,000 was *272 paid in settlement of Bogeaus' guaranty liability. We are disposed to agree with petitioners' statement on brief that the issue is factual. If, in fact, Bogeaus did guarantee his insolvent corporations' obligations, his payment in settlement of the obligations pursuant to such guaranty would give rise to a nonbusiness bad debt loss in the year of payment even though the corporations were insolvent when the payment in satisfaction of the contract of guaranty was made. Putnam v. Commissioner, 352 U.S. 82 (1956); and Bert W. Martin, 52 T.C. 140 (1969). It was petitioners' burden under their theory to show that the suits against Bogeaus were founded on his liability as guarantor of the corporations' obligations. It is true that Adele I. Springer, the attorney who represented Bogeaus and the corporations in the suits, said the lawsuits were brought against Bogeaus personally on guarantees that he had made for the corporations. [1] She testified as to her recollection of what these lawsuits, that were settled some five years before trial, involved. On crossexamination *273 she said it was her recollection that Bogeaus was sued on his personal guarantees for the corporations. She said the suits as against Bogeaus were based upon his "written guarantees." No written guarantees were produced. The attorney said she did not search for these guaranty documents because the bulk of her files had been returned to Bogeaus before he died and as she said, "it is impossible to try to dig for anything in that mountain of files that accumulated through all those years." There is nothing to indicate she had ever reviewed the pleadings in the lawsuits before testifying and there is no suggestion in the record that the pleadings in these lawsuits, which were filed in the Superior Court of California for the County of Los Angeles, were not readily available. The only document pertaining to the lawsuits that was introduced by petitioners was the agreement of May 15, 1964, that settled the cases. In effect, this document controverts the testimony of Bogeaus' attorney that the suits were based on Bogeaus' written guaranty of the obligations of his corporations. The agreement of settlement of the lawsuits shows affirmatively that the suits against Bogeaus and his corporations *274 asserted liability against Bogeaus on his two promissory notes and on an open account in the total amount due of around $35,000 and against the corporations on amounts due under their contracts, notes, and on open accounts. There is no mention made of any asserted guaranty liability and the settlement agreement provides that $25,000 of the $100,000 being paid was "in full satisfaction and full release of all claims against BENEDICT E. BOGEAUS, Individually" and the remaining $75,000 "shall be in full payment of all of the other obligations alleged in said actions, in full satisfaction thereof * * *." It is clear that no guaranty obligation was satisfied by the $25,000 paid to settle 471 Bogeaus' notes and account. We *275 can agree that the balance, or $75,000, was in effect paid by Bogeaus to settle obligations of his corporations but the settlement agreement does not give the slightest indication that this payment was to be in discharge of a guaranty obligation. We find petitioner failed to sustain the burden of showing the $75,000 paid by Bogeaus to settle his insolvent corporations' obligations was pursuant to any guaranty he had made. We uphold respondent with respect to his disallowance of the $100,000 short-term capital loss. The remaining issue is with respect to respondent's disallowance of legal fees paid by Bogeaus to various attorneys in the total amount of $14,500. To support this deduction petitioners introduced evidence of Bogeaus' payments of litigation expenses in the total sum of around $15,000 In 1964 Bogeaus paid attorney Springer $9,150 for attorney's fees, costs and expenses in connection with the foregoing suits and the settlement of said suits. [2] Petitioners state on brief that this expenditure was for "expenses in connection with the suit and settlement regarding petitioners guarantees" and they argue it "is fully deductible as an ordinary deduction in 1964", citing *276 sec. 165(c)(2), I.R.C. of 1954. The cited section grants a deduction for "losses incurred in any transaction entered into for profit, though not connected with a trade or business * * *." We have stated that petitioners failed to establish that the suits for which these expenditures were made involved Bogeaus' liability as guarantor. We held above that the advancement to settle these suits was not a payment in satisfaction of a guaranty. If the advancement to pay corporate debts does not qualify as a guaranty payment, deductible by Bogeaus as a nonbusiness bad debt, then obviously legal expenses with respect to the advancement would not qualify for deduction under any theory. Petitioners cite Marjorie Fleming Lloyd-Smith 40 B.T.A. 214 (1939), and Peter Stamos, 22 T.C. 885 (1954). The cases are not in point. In each of those cases we held the guaranty *277 was given in a transaction entered into for profit and therefore the legal expenses incurred in settling the guarantor's liability was deductible as an ordinary loss. Here it cannot be said the advancement was made in any transaction entered into for profit. To the extent that the fees paid to attorney Springer were for services performed for settling the cases against the corporations there could be no deduction by Bogeaus. This portion of the fee paid by Bogeaus would merely be capital contributions to the corporations. To the extent that the fee paid to attorney Springer was for services in defending the asserted liability against him on his notes and open account, there would be no deduction. There is nothing in the record to show that such obligations arose out of any business transaction or any transaction entered into for profit. We do not know the nature of the debts. The only thing the record shows is that he was sued on an indebtedness incurred by him and the cases were settled. Such evidence would be insufficient to support the deduction of the $25,000 paid by Bogeaus to settle his indebtedness. Petitioners failed to sustain their burden with respect to the above legal expenditure *278 and the same is not deductible. In 1964 Bogeaus paid $1,035 to attorney Moidel and $1,300 to attorney Springer and $150 to an appraiser for legal fees, costs, and expenses in connection with a suit to prevent foreclosure of a mortgage on his residence. This mortgage had been given by Bogeaus as collateral in order to secure an extension of time for payment of loans to several of his corporations. Petitioners argue the expenditure would be deductible under sec. 165(c)(2), I.R.C. of 1954, supra, but there is no evidence that would even suggest that the transaction that gave rise to the legal services was entered into by Bogeaus for his individual profit. In principle, the giving of a mortgage on his home by Bogeaus as collateral security for his corporations' debts does not differ from a guaranty of the debts by Bogeaus. Any loss resulting from such a guaranty transaction would be no more than a nonbusiness bad debt deductible as a short-term capital loss and not fully deductible as a loss incurred in a transaction entered into for profit. Putnam v. Commissioner, supra.There is therefore no basis for considering legal expenses incurred in connection *279 with such a guaranty as an ordinary nonbusiness loss sustained in a transaction entered into for profit. 472 In 1964 Bogeaus paid $3,250 to attorney Weinberg for legal services performed in 1961 with respect to a credit card pressing machine. It was Weinberg's testimony that the legal services were performed for Bogeaus personally and not for his corporations and the legal services were in connection with a transaction involving a credit card pressing machine which had been invented by Bogeaus and licensed to a company called Dashew Business Machines. Petitioners argue the "services were rendered in connection with the licensing of a credit card machine for petitioner." When all of Weinberg's testimony is considered, we feel it does support petitioners' position that the legal services were in connection with the licensing of the machine. As such, the amount paid Weinberg, or $3,250, would be deductible as a loss incurred in a transaction entered into for profit. In 1964 Bogeaus paid attorney Springer $113.50 for costs and legal services in connection with an attachment suit. A man by the name of Berkowitz sued Bogeaus and attached money that was in escrow on the closing of *280 the Tapeprinter Company sale. Berkowitz was claiming money due him from the proceeds of the sale as commissions. Attorney Springer received a $100 fee for drawing the answer to the complaint and $13.50 for the cost of filing the answer. This was a legal expense connected with the sale of Bogeaus' interest in the Tapeprinter Company and petitioners argue it is deductible under sec. 165(c)(2), I.R.C. of 1954. This would be a deductible item of expense in arriving at the net capital gain resulting from the sale of Bogeaus' interest in Tapeprinter. It would not be deductible as a loss incurred in a transaction entered into for profit. Decisions in all of the dockets will be entered under Rule 50. Footnotes
1. She also said, in answer to a leading question by petitioners' counsel, that the lawsuits also claimed Bogeaus was liable for the total sum due "as an alter ego" of his corporations. However, the settlement agreement recognizes the separate existence of the corporate entities and no argument is made by petitioners as to any alter ego theory or that the corporations were to be regarded as mere conduits for the transaction of Bogeaus' own personal business.↩
2. Petitioners argue the payment was $9,400 but that figure includes a payment to attorney Springer of $250 that is labeled "Miscellaneous."↩